United States Courts
Southern District of Texas
FILED

DEC 2 0 2010

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIMINAL CASE NO. |
| | § | |
| v. | § | COUNT ONE: **10 CR 886** |
| | § | 18 U.S.C. § 371 |
| GERALD R. EVERSOLE | § | |
| | § | COUNT TWO and THREE: |
| and | § | 18 U.S.C. § 666(a)(2), (a)(1)(B) |
| | § | |
| MICHAEL D. SURFACE, | § | COUNT FOUR and FIVE: |
| | § | 26 U.S.C. § 7206(1) |
| Defendants. | § | |
| | § | |

## INDICTMENT

The grand jury charges:

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

**UNSEALED
PER ARREST**

### INTRODUCTION

At all relevant times:

### HARRIS COUNTY, TEXAS

1.      Harris County, Texas ( the "County") was a political subdivision within the State of Texas that was divided into four geographic precincts.

2.      The County was governed by a Commissioner's Court composed of four Commissioners, one from each precinct, and an elected County Judge. Commissioners were empowered to place matters on the Court's agenda and to vote on all matters properly before the Court, including votes to award contracts (a) to buy, sell and lease buildings for use by government agencies and employees; and (b) to build and maintain roads in the County. Commissioners also voted to appoint people to serve in certain County boards and positions.

3.      In each of the years 2000 through 2008, the County received more than $10,000 in

federal assistance for various purposes including, among others, to build and maintain roads, and to provide services related to youth and gang violence, the operation and management of a juvenile justice system, maternal and infant nutrition services, and community development.

## INDIVIDUALS AND ENTITIES INVOLVED

4.      From in or about 1992 through the present, defendant GERALD R. EVERSOLE served as the elected Harris County Commissioner for Precinct Four.  In his official position, EVERSOLE oversaw the daily operations of Precinct Four.

5.      In his official position, EVERSOLE also proposed and voted on agreements to lease and purchase land and buildings needed to carry out the functions of the County, the award of contracts to build and maintain roads in the County, and appointments to positions on public boards, commissions and corporations.

6.      As a County Commissioner, EVERSOLE was bound by the following duties and laws:

a.      EVERSOLE owed a duty of honest services to the people of the County and to the County in the performance of his public duties.

b.      EVERSOLE was required, under Texas Local Government Code §§ 159.001 to 159.003, to file a detailed financial disclosure statement under oath with the County Clerk each year on or before April 30th of the subsequent calendar year.  The statement required him to disclose, among other things, any occupational income and interests in businesses; interest, dividend, royalty, and rent income over $500; loans and loan guarantees over $1,000, and all gifts or things of value EVERSOLE received worth over $250 from anyone other than a close family member, with certain limited exceptions.

2

7.    At all times relevant to the indictment, defendant MICHAEL D. SURFACE was a commercial real estate developer based in Harris County, Texas.  SURFACE had served as the director of the Harris County Facilities and Property Maintenance department ("FPM") from in or about August 1995 until May 1998.  When SURFACE resigned from the County, SURFACE became a part owner of The Keystone Group, Inc. ("Keystone") and other partnerships or business entities which were formed to bid on and perform contracts with governments to provide property and buildings for offices and other business activities.  In or about mid-2004, SURFACE became the sole owner of Keystone.

8.    SURFACE and his partners profited from the sale of property under lease-purchase agreements, traditional leases, and sales of property to the County. They also profited from fees for construction services to modify the property to be leased or sold to the County.

9.    After he left County employment, SURFACE also took steps to obtain appointments to public offices in the County.

## HARRIS COUNTY SPORTS AND CONVENTION CORPORATION

10.    In or about January 1999, the County created the Harris County Sports and Convention Corporation (the "Sports and Convention Corporation").  The Sports and Convention Corporation was created primarily to oversee the construction and operation of Reliant Stadium and Reliant Park, a County-owned development located in Houston that housed, among other things, a professional football team and the Houston Livestock Show & Rodeo.

11.    The Sports and Convention Corporation was headed by a Chairman and Board of Directors, all of whom were unpaid and appointed for three year terms. Each Commissioner recommended a member of the Board for appointment, and the Board members and the

3

Chairman were subject to approval by a majority vote of the Court. The day to day operations of

the Sports and Convention Corporation were overseen by an Executive Director and a staff of

employees.

## COUNTY CONTRACTS

12.    Beginning in or about 1999, SURFACE and his partners sought and obtained at

least four County contracts, all of which were entered into after votes by the Commissioners'

Court. The projects included:

a.    A lease-purchase agreement to provide office space for the County's Child

Protective Services department and other County departments on property located at 2525

Murworth Street in Houston, which the Court voted to award on or about February 9, 1999 and

the County entered into with Keystone's nominee entity on or about March 16, 1999 ("Murworth

I");

b.    A lease-purchase agreement to provide office space for the County's

Community Development Agency, Juvenile Justice Alternative Education Program, and other

offices in additional space at 2525 Murworth Street, which the Court voted to award on August

24, 1999, and the County entered into with Keystone's nominee on or about April 1, 2000

("Murworth II"). The County also entered into a temporary lease for this space from December

1999 through April 1, 2000;

c.    A lease-purchase agreement to provide a Maintenance Camp for Harris

County's Precinct One operations on property located at 7901 El Rio Drive in Houston, which

the Court voted to award on September 3, 2000 and the County entered into with Keystone's

nominee entity on or about October 3, 2000 ("Precinct One Maintenance Camp"); and

4

d.    A contract, which the Court voted to approve on or about March 20, 2001, to provide construction management services in connection with the construction of a County toll road by the Harris County Toll Road Authority, in which SURFACE and his partners had financial interests in fees to be generated from a subcontract awarded by the prime construction management contractor ("West Park Toll Road").  SURFACE and his partners also had an interest because portions of the planned toll roads would link the western suburbs of Houston, including land in a residential development owned by SURFACE, with central Houston.

13.    Beginning in or about September 2004, SURFACE sought and obtained for himself a contract to provide office space for the County's Juvenile Probation Services, Women and Infant Children program, and Public Health and Environmental Services offices on property located at 5815 Antoine Street in Houston, which the Court voted to award to SURFACE's nominee entity on or about April 4, 2006 and June 20, 2006, and voted to fund on or about July 11, 2006 ("Annex A").

## COUNT ONE
### Conspiracy - 18 U.S.C. § 371

14.    Paragraphs 1 through 13 of this Indictment are realleged and incorporated as if fully set forth herein.

### THE CONSPIRACY AND ITS OBJECTS

15.    Beginning in or about 2000 and continuing through in or about January 2010, in the Houston Division of the Southern District of Texas and elsewhere, defendants

### GERALD R. EVERSOLE
### and
### MICHAEL D. SURFACE,

did knowingly combine, conspire, confederate and agree with each other and others known and unknown to the grand jury to commit offenses against the United States, that is:

a.    to corruptly give, offer, and agree to give anything of value to EVERSOLE, a Harris County Commissioner and an agent of Harris County, a local government which received federal assistance in excess of $10,000 within each relevant period, with the intent of influencing and rewarding him, in connection with a business, transaction, and a series of transactions valued at $5,000 or more, that is payments made by Surface to and for EVERSOLE's benefit in an amount over $100,000 to obtain County contracts, appointments, and other benefits for SURFACE and others, in violation of Title 18, United States Code, Section 666(a)(2); and

b.    for an agent of a local government which received federal assistance in excess of $10,000 in a one-year period, to corruptly solicit and demand for the benefit of any person, and to accept and agree to accept anything of value from any person, intending to be

6

influenced and rewarded in connection with any business, transaction, and series of transactions

of the local government involving anything of value of $5,000 or more, that is payments totaling

over $100,000 to and for Harris County Commissioner EVERSOLE's personal benefit by

SURFACE to obtain County contracts, appointments, and other benefits for SURFACE and

others, in violation of Title 18, United States Code, Section 666(a)(1)(B).

## THE PURPOSE OF THE CONSPIRACY

16.    The purpose of the conspiracy was for SURFACE to secretly enrich EVERSOLE

with money and things of value, to influence and reward EVERSOLE for using his official

position as a Harris County Commissioner, and to benefit SURFACE financially and

professionally.

## THE MANNER AND MEANS OF THE CONSPIRACY

17.    The manner and means by which EVERSOLE and SURFACE sought to

accomplish the objects of the conspiracy included the following:

a.    To influence EVERSOLE and to reward him for using his position as a

Harris County Commissioner as needed for SURFACE's benefit, SURFACE would and did

make payments directly to EVERSOLE and to third parties for EVERSOLE totaling more than

$100,000, including: a cashier's check for $63,000 EVERSOLE used to buy his new house;

$16,975 in payments for landscaping expenses; $1,075 for a custom tailored suit; payments for at

least five antique firearms and new ivory grips for several of EVERSOLE's firearms; and travel

expenses involving at least eight vacations.  As part of this scheme, SURFACE also posted

$25,000 in collateral for and guaranteed a personal bank loan for EVERSOLE, gave EVERSOLE

$11,760.62 purportedly for the inventory of EVERSOLE's failed spur business, gave

7

EVERSOLE approximately $12,700 purportedly to buy personal property from EVERSOLE when EVERSOLE wanted to dispose of such items, and rented EVERSOLE an apartment at less than SURFACE's costs for the apartment.

        b.     SURFACE would and did give, offer and agree to give a stream of things of value to EVERSOLE in order to influence, motivate, and reward EVERSOLE to use his official position to benefit SURFACE and his partners by voting to award at least five multi-million dollar County contracts, to secure funding for these contracts, to approve other contracts in which SURFACE and his partners had a financial interest, and to take steps as necessary to renew such leases and administer such contracts. SURFACE also offered and gave EVERSOLE things of value to appoint and to re-appoint SURFACE as a member and Chairman of the Board of the Sports and Convention Corporation, and to take other steps to promote SURFACE's interest in holding other political offices.

        c.     EVERSOLE would and did accept the money and things of value from SURFACE intending to be influenced and rewarded to use his position as a Harris County Commissioner to benefit SURFACE by funding, awarding, and administering County contracts; appointing and reappointing SURFACE to the Sports and Convention Corporation; and planning with SURFACE to arrange to have SURFACE be appointed as his replacement upon EVERSOLE's resignation.

        d.     To perpetuate the conspiracy, to attempt to prevent its detection, to conceal the nature and source of things of value provided to EVERSOLE, and to maximize revenues to EVERSOLE, SURFACE and EVERSOLE attempted to conceal the true nature and extent of their relationship in the following way, among other things:

8

1.    SURFACE would and did create subsidiaries and nominee entities to seek and obtain the County contracts, and he would and did hire nominees to present the proposals in public settings on his behalf;

2.    SURFACE would and did obtain cashier's checks and official checks to disguise his payments to EVERSOLE, including a cashier's check for $63,000; cause a false invoice to be prepared to disguise a $16,975 payment; and make payments to third parties instead of making payments to EVERSOLE directly;

3.    EVERSOLE would and did prepare and file and caused to be prepared and filed with the County Clerk under oath false and misleading financial disclosure statements which were required by law and which omitted and otherwise concealed payments, loan guarantees and other financial transactions between EVERSOLE and SURFACE;

4.    EVERSOLE would and did fail to report as income on his federal income tax returns the money received from SURFACE directly and indirectly and evaded the payment of taxes due on those sums; and

5.    EVERSOLE and SURFACE created a false document and attempted to obtain other documents and records, and SURFACE falsely stated to other individuals that he had a joint gun collection with EVERSOLE to create a false cover story for certain payments by SURFACE to EVERSOLE.

## OVERT ACTS

18.    In furtherance of the conspiracy and to accomplish its objects, at least one of the co-conspirators performed and caused to be performed at least one of the following acts among others in the Southern District of Texas and elsewhere in furtherance of the conspiracy:

9

## THINGS OF VALUE PROVIDED BY SURFACE
## FOR EVERSOLE'S ASSISTANCE

a.      On or about August 24, 2000, SURFACE gave EVERSOLE a check for $11,760.62, purportedly to purchase the inventory of EVERSOLE and his partner's failing business, the "Salt Springs Spur Company."

b.      On or about April 5, 2002, SURFACE paid $1,742.40 by check for a week-long ranch vacation in July 2002 for EVERSOLE and SURFACE.

c.      On or about April 10, 2002, SURFACE paid $7,600 by check to a firearms dealer for two antique firearms for EVERSOLE.

d.      On or about June 24, 2002, SURFACE paid $1,075 for a custom tailored suit provided to EVERSOLE.

e.      On or about August 2, 2002, SURFACE paid EVERSOLE $4,700 by check, with the memo line on the check stating "pistols/ rifle/clothes."

f.      On or about August 26, 2002, SURFACE paid $4,871.25 by check to a firearms dealer to purchase an antique firearm for EVERSOLE.

g.      On or about September 1, 2002, SURFACE incurred charges totaling $1,037.64 on his Keystone corporate credit card for lodging expenses for SURFACE, EVERSOLE and another person at a Texas golf resort; SURFACE later annotated the charges on his credit card statement as "[Person], Eversole Marketing Trip."

h.      On or about September 4, 2002, SURFACE paid approximately $9,169.95 by check to a firearms dealer, of which approximately $5,075 purchased an antique

10

firearm and seven sets of ivory grips to be installed on other firearms for EVERSOLE.

       I.     On or about October 9, 2002, SURFACE paid $6,525 to a firearms dealer to purchase an antique firearm for EVERSOLE.

       j.     On or about November 5, 2002, SURFACE paid $5,000 to a firearms dealer to regrip three of EVERSOLE's antique firearms, and on or about January 16, 2003, SURFACE made a second payment of $5,225 to the same dealer for the same work.

       k.     In or about November 19, 2002 through November 23, 2002, SURFACE incurred approximately $880.25 in credit card charges for lodging expenses while on a trip with EVERSOLE and another County official to Arizona and New Mexico.

       l.     On or about March 6, 2003, SURFACE wrote a check from his personal bank account for $65,000 to Weston Lakes L.P., a partnership SURFACE and his partners established to hold interests in real estate but which at that time had no business activities ("W LP"). On or about March 24, 2003, SURFACE caused a check to be issued in the amount of $65,000 from W LP to Keystone and deposited into a Keystone bank account. That same day, SURFACE caused Keystone to issue a cashier's check to SURFACE in the amount of $65,000. Still on that same day, SURFACE used the $65,000 Keystone cashier's check to purchase another cashier's check payable to EVERSOLE in the amount of $63,000. SURFACE then provided the cashier's check to EVERSOLE.

       m.     On or about March 25, 2003, EVERSOLE deposited the $63,000 cashier's check into one of his personal bank accounts. At the time he did so, EVERSOLE had taken out a loan to purchase land on which to build a new home, and the balance on this loan, over and above the value of the collateral held by the lending institution, was $62,594. On the day he

deposited the check from SURFACE, EVERSOLE was obligated to pay off his lot loan in full on or before March 27, 2003.

n.    In or about August and September 2003, SURFACE paid approximately $1,000 of EVERSOLE and his wife's travel expense, including airfare, lodging and entertainment, to travel to Las Vegas with SURFACE and his wife in September 2003.

o.    From in or about October 2003 through at least November 2003, SURFACE provided EVERSOLE a fully furnished apartment with utilities included in the River Oaks area of Houston for a total rent payment of $2,000, an amount below the monthly mortgage payment SURFACE owed on the apartment.

p.    On or about October 8, 2003, in anticipation of EVERSOLE's move to his new residence in Houston, SURFACE paid EVERSOLE $8,000 by check for a gun safe and fitness equipment that EVERSOLE no longer wished to own.

q.    In or about March 2004, to conceal SURFACE's payment of a portion of the landscaping charges at EVERSOLE's new house, SURFACE caused the landscaper to create a false invoice billing one of SURFACE's companies purportedly for services to that entity.

r.    On or about March 31, 2004, SURFACE caused a company he controlled to pay $16,975 of EVERSOLE's $26,975 landscaping bill for work on EVERSOLE's new residence.

s.    On or about April 16, 2004, EVERSOLE sought and obtained a $25,500 loan from a local bank; SURFACE personally guaranteed the loan, and he provided $25,000 by check to the bank to use as collateral for the loan.

t.    In or about June 2004, SURFACE paid approximately $1,000 for

12

EVERSOLE and his wife's travel expenses, including airfare and car rental fees, for a golf trip with SURFACE in South Carolina from June 17, 2004 to June 20, 2004.

u.      In or about June 2006, SURFACE paid over $1,000 for EVERSOLE's travel expenses, including airfare and lodging, for EVERSOLE to travel with SURFACE for a golf trip in New Mexico and Texas from June 22, 2006 through June 26, 2006.

v.      In or about January 2007,  SURFACE paid for EVERSOLE's travel expenses, including entertainment and lodging, to travel with him to San Antonio to play golf from on or about January 26, 2007 through January 28, 2007.

w.      In or about June 2007, SURFACE paid over $1,000 for EVERSOLE's travel expenses, including airfare, rental car and lodging, for a trip he and EVERSOLE took to Colorado, Montana, Wyoming, and South Dakota from June 20, 2007 through June 23, 2007.

x.      In or about October 2007, SURFACE paid for EVERSOLE's airfare expenses totaling approximately $370 for a trip to Reno, Nevada to play golf on October 4, 2007, from which EVERSOLE returned home unexpectedly.

## ACTIONS TAKEN BY EVERSOLE FOR SURFACE'S BENEFIT
## HARRIS COUNTY SPORTS AND CONVENTION CORPORATION

y.      Having moved for and voted for SURFACE's appointment as a member of the Sports and Convention Corporation's Board of Directors and as Chairman of the Board on or about January 26, 1999, EVERSOLE wrote a letter on or about January 22, 2002 placing SURFACE's reappointment as Chairman of the Board of Directors on the Court's agenda for its January 26, 2002 meeting.

z.      On or about January 26, 2002, EVERSOLE moved for the Court to

13

reappoint and voted to reappoint SURFACE at the Court's meeting.

   aa. Beginning at least in or about 2003, SURFACE and EVERSOLE considered a plan whereby EVERSOLE would resign as Commissioner and secure the appointment of SURFACE as his replacement so that SURFACE could run with the advantages of an incumbent in the next election for Commissioner for Precinct Four to succeed EVERSOLE. At about the same time, in or about March 2003, SURFACE gave EVERSOLE a cashier's check for $63,000 to use for the purchase of his residence, and for part of that time, SURFACE was EVERSOLE's landlord.

   bb. On or about February 17, 2004, EVERSOLE wrote a letter placing SURFACE's re-appointment as Chairman of the Sports and Convention Corporation on the Court's agenda for its February 17, 2004 meeting.

   cc. On or about February 17, 2004, approximately two weeks before SURFACE paid $16,975 of EVERSOLE's $26,975 landscaping bill, EVERSOLE moved for the Court to reappoint and voted to reappoint SURFACE as Chairman of the Sports & Convention Corporation until January 26, 2005.

   dd. On or about February 1, 2005, EVERSOLE wrote a letter placing SURFACE's re-appointment as Chairman of the Sports and Convention Corporation on the Court's agenda for its February 8, 2005 meeting.

   ee. On or about February 8, 2005, EVERSOLE voted to reappoint SURFACE as Chairman of the Sports and Convention Corporation for a term from February 8, 2005 through February 8, 2008.

## COUNTY PROJECTS

### MURWORTH I

ff.    Having initially abstained from the Murworth I project votes because of a conflict of interest, EVERSOLE voted to renew the Murworth I lease-purchase agreement on the following dates, at an approximate cost of $900,000 per year for 20 years, and to take other administrative action necessary under the lease:

1.    April 18, 2000;

2.    February 6, 2001;

3.    March 5, 2002;

4.    February 18, 2003;

5.    February 17, 2004;

6.    February 25, 2005; and

7.    February 7, 2006.

During the same period that EVERSOLE voted on this project, EVERSOLE received a stream of things of value from SURFACE including firearms, a payment to EVERSOLE, and payments to third parties for EVERSOLE's benefit, a loan guarantee, and travel and entertainment expenses.

### MURWORTH II

gg.    Having initially abstained from votes on the Murworth II project due to a conflict of interest, EVERSOLE voted to approve the Murworth II lease-purchase agreement with the Keystone nominee entity on August 24, 1999, and he voted to renew the Murworth II lease on or about the following dates, at an approximate cost of $780,000 per year for 20 years, and to take other administrative action necessary under the lease:

1.    February 6, 2001;

2.    March 5, 2002;

3.    February 18, 2003;

4.    December 16, 2003;

5.    February 17, 2004;

6.    January 25, 2005;

7.    February 7, 2006; and

8.    January 23, 2007.

During the same period that EVERSOLE voted on this project, EVERSOLE received a stream of

things of value from SURFACE including firearms, a payment to EVERSOLE, and payments to

third parties for EVERSOLE's benefit, a loan guarantee, and travel and entertainment expenses.

## PRECINCT ONE MAINTENANCE CAMP

hh    In or about March 2000, in anticipation of leasing or selling the property to

the County, SURFACE and his partners in Keystone entered into a contract giving them an

option to purchase the land and buildings located at 7901 El Rio Street in Houston and an

additional two acres of land nearby for $1,635,000.

ii.    On or about July 24, 2000, having already been awarded the Murworth I

and Murworth II contracts, and in order to conceal from media scrutiny their attempt to obtain the

Precinct One Maintenance Camp contract, SURFACE and his partners formed an entity called El

Rio Development, L.L.C. (ERD) and transferred Keystone's interest in the property at 7901 El

Rio Street and the additional land to ERD.  In a further attempt to avoid scrutiny, one of

SURFACE's partners at Keystone was listed as the owner of ERD, even though SURFACE was

16

to share in any future ERD profits through consulting fees paid to Keystone.

        jj.    On or about July 25, 2000, ERD submitted its bid for the Precinct One Maintenance Camp contract.

        kk.    On or about September 17, 2000, Eversole voted to approve the award of the Precinct One Maintenance Camp contract to ERD at an annual cost of approximately $754,000 per year for 20 years, approximately one month after SURFACE gave EVERSOLE a check for $11,760.62.

        ll.    On or about October 3, 2000, EVERSOLE voted to approve the Precinct One Maintenance Camp lease-purchase agreement between the County and Keystone's nominee entity.  For the period from at least June 1, 2001 through February 20, 2007, EVERSOLE voted to direct and approve of other steps to be taken by County staff to administer the contract, including votes related to the construction supervised by Keystone under the contract and to renew the lease with the Keystone nominee entity.

        mm.    On or about October 6, 2000, one of the competing bidders complained about the selection process and the selection of ERD as the winning bidder. To induce that party to stop pursuing its claims, SURFACE offered the other bidder the contract to provide construction services on the project.

## THE WESTPARK TOLL ROAD

        nn.    In or about 2000, SURFACE and his partners began negotiations with other companies to form a joint venture with dedicated subcontractors to seek a long term County contract to provide engineering inspection services for the construction of the Westpark Toll Road.  On or about December 2000, SURFACE and his partners created Comprehensive

Universal Services, L.P. ("CUS") for that purpose.

oo.     On or about March 20, 2001, EVERSOLE introduced a resolution to award the Westpark Toll Road contract without competitive bidding to the joint venture with whom CUS was to subcontract, and EVERSOLE voted to award the contract, which obligated the County to pay $1,095,000 initially for the services and was subject to expansion of the services to be provided.

pp.     From August 20, 2001 through in or about April 16, 2002, EVERSOLE moved for consideration of and voted approximately 12 times to direct that the County make payments totaling approximately $6,270,000 to the joint venture, which then made payments to CUS.  Between in or about April 5, 2002, and in or about November 23, 2002, SURFACE paid a total of approximately $29,000 to firearms dealers for antique firearms and grips for firearms for EVERSOLE, paid $1,075 for a custom tailored suit for EVERSOLE, paid for approximately $1,500 in golf, travel and entertainment expenses for EVERSOLE and himself and gave EVERSOLE a check for $4,700 purportedly to purchase "pistols/rifles/clothes" from EVERSOLE.

qq.     SURFACE profited from the contract through consulting services paid by CUS to Keystone which were then distributed to him.

## ANNEX A

rr.     In or about September 2004, knowing that the existing lease was about to expire on the existing County facility known as Annex A, SURFACE contacted the Director of Facilities and Property Management, a department within County government.  SURFACE showed the FPM Director property located at 5815 Antoine Street in Houston, stated he was

considering buying the property in order to sell or lease it to the County as a replacement for Annex A, and asked the FPM director if he thought the County would want that property.

ss.    On or about September 24, 2004, SURFACE entered into a contract providing him with the option to buy the 5815 Antoine property from its owner for approximately $2,000,000.

tt.    In or about January 2005, SURFACE purchased the property at 5815 Antoine, intending to sell or lease it to the County, although the bidding process had not yet commenced. SURFACE purchased the building and grounds at 5815 Antoine in Houston through an entity called Town & Country L.P., and he began making mortgage and other payments while he pursued selling the property to the County.

uu.    To conceal from media scrutiny his plan to sell or lease the property to the County, SURFACE took the following steps:

1.    On or about February 7, 2005, SURFACE caused to be formed HC 5815 L.L.C., an entity which disclosed no connection to SURFACE in its public records.

2.    On or about February 7, 2005, SURFACE transferred the 5815 Antoine property to HC 5815 L.L.C., subject to an agreement between SURFACE and the nominee owner of HC 5815 L.L.C. that profits from the Annex A project would be transferred back to SURFACE. To further avoid public scrutiny, SURFACE also contracted with nominees to present the bid for him for a fee of approximately $125,000.

3.    SURFACE caused HC 5815 L.L.C.'s bid documents, which were submitted on or about April 4, 2005 and October 24, 2005, to contain no reference to either SURFACE or Keystone.

19

vv.    On or about February 16, 2005, EVERSOLE voted to approve efforts by the County staff to try to renegotiate the existing lease for Annex A, and simultaneously to hire a broker to find potential replacement properties.

ww.    On or about April 4, 2005, SURFACE's nominees submitted his proposal to provide new office space for the County tenants in Annex A.

xx.    The County received only one other bid for the Annex A project, which was rejected for being filed late on the due date. After complaints by that bidder that his bid was rejected unfairly merely because he lacked established relationships with Commissioners Court, on or about May 31, 2005, EVERSOLE voted to adopt FPM's recommendation that both bids be rejected and the bidding process restarted.

yy.    On or about October 24, 2005, SURFACE caused his nominees to present another bid proposal for him to provide new office space for the County tenants in Annex A.

zz.    On or about April 4, 2006, EVERSOLE moved to consider and voted to approve the award of the Annex A project to HC 5815 L.L.C.

aaa.    On or about April 18, 2006, EVERSOLE and his Chief of Staff met with the FPM Director to discuss how to handle a follow-up complaint by the same losing bidder, who had again challenged the contract award as made to a company with improper influence with County officials.

bbb.    Despite requests by County staff to withdraw the Annex A contract vote from the Court's agenda at its June 20, 2006 meeting if funding had not been authorized, EVERSOLE moved for consideration of and voted to approve a contract with HC 5815 L.L.C. to purchase the building and to pay for construction modifications to be completed by HC 5815

L.L.C. at an approximate cost of $4,867,820.

ccc.    At the June 20, 2006 hearing, EVERSOLE complained about the funding

issue further delaying the project, and he urged that funding be made available immediately for

the project:

| MR. EVERSOLE: | Judge, under [the county agenda item to approve the deal and purchase order] I show that to be approved subject to funding at CIP. That was my . . . |
| MR. ECKELS: | Yes sir. |
| MR. LEE: | And you're okay with that recommendation? |
| MR. EVERSOLE: | I'm okay if this is moving forward. |
| MR. LEE: | Subject to. |
| MR. EVERSOLE: | Sure. |
| MR. RAYCRAFT: | To the money. |
| MR. LEE: | Subject to the money being available. |
| MR. EVERSOLE: | Well, I thought we did that two years ago?  That was my question and that was my problem with it not getting the funding at CIP. That's the annex you and I have got. |

ddd.    On June 22, 2006, EVERSOLE's Chief of Staff at his direction emailed

the County budget director and said, "Commissioner asked that I follow up with you and obtain

the funding information for Annex A that was discussed at Tuesday's court meeting. When the

budget director replied that he planned "to have it on the agenda for the next meeting, 7/11,"

EVERSOLE's Chief of Staff replied, "Commissioner would like to see the information as soon

as you have it ready . . . prior to July 11 court agenda."

eee.    In response to an email from the budget director asking "what

information" was sought, EVERSOLE's chief of staff further replied:

> At the 6/20/06 Comm. Court meeting you indicated, relating to Annex A, that "we'll bring back the recommendation on the funding at the next meeting." [Another Commissioner] further indicated that 'you're going to have a funding plan at the next meeting" to which you responded "yes sir." That is the information that my Commissioner wants to see prior to the 7/1/06 court agenda–your recommendation for the funding for Annex A.

   fff. On June 22, 2006, two days after EVERSOLE advocated for project funding, moved for consideration of the project, and voted to award the contract to SURFACE's nominee, EVERSOLE flew to New Mexico on plane tickets paid for by SURFACE. EVERSOLE, SURFACE and another person then traveled through New Mexico and Texas playing golf from June 22, 2006 through June 26, 2006.

   ggg. On or about June 26, 2006, while on the golf trip as SURFACE's guest, EVERSOLE called the FPM Director to direct him to arrange the Annex A funding without further delay.

   hhh. In response to EVERSOLE's phone call, on or about June 26, 2006, the FPM executive director emailed EVERSOLE's chief of staff and explained that:

> the Commissioner called me this afternoon regarding his continued support for CIP funding of the  purchase of the replacement facility for Annex A.  I told him I would 'bird dog' it, so I went to see [another county employee] to impress on him the significance of funding appropriation being on the next court session.  He said that he had previously talked to [the Budget Director] and had gotten the 'go ahead' to fund the project . . . .  If you speak with the Commissioner, and you feel it is appropriate, will you please relay the message.

   iii. On or about June 26, 2006, EVERSOLE's Chief of Staff replied to the FPM director, "I spoke with my Commissioner and relayed this information to him. He said thank you."

jjj.    On or about July 11, 2006, EVERSOLE moved for consideration of and voted to approve the funding for the Annex A project.

kkk.    On or about the following dates, EVERSOLE voted to approve matters necessary to implement the Annex A contract: November 21, 2006, June 19, 2007 and July 10, 2007.  During this same period, SURFACE paid for travel and lodging expenses on trips he and EVERSOLE took in January, June and October 2007 to, respectively, San Antonio, Texas; Colorado, Wyoming, South Dakota, and Montana; and Reno, Nevada.

## FAILURE TO DISCLOSE THINGS OF VALUE PROVIDED BY SURFACE TO EVERSOLE

lll.    On or about April 29, 2003, EVERSOLE caused to be filed his annual financial disclosure statement for calendar year 2002, in which EVERSOLE failed to disclose, as required by law, his receipt of, among other things, the following things of value:

1.    SURFACE's purchase of two antique firearms for EVERSOLE from a firearms dealer for which he paid approximately $7,600 in or about April 2002;

2.    SURFACE's purchase of a custom tailored suit for EVERSOLE for which SURFACE paid $1,075 on or about June 24, 2002;

3.    SURFACE's payment of $1,742.40 in April 2002 for lodging expenses at a ranch for SURFACE and EVERSOLE for a trip taken from July 3, 2002 through July 10, 2002;

4.    SURFACE's purchase of an antique firearm for EVERSOLE from a firearms dealer for $4,871.25 on or about August 26, 2002;

5.    SURFACE's purchase of an antique firearm and for seven sets of

23

ivory grips to be installed for EVERSOLE from a firearms dealer for approximately $5,075 on or about September 9, 2002;

      6.    SURFACE's purchase of an antique firearm for EVERSOLE from a firearms dealer for $6,525 on or about October 9, 2002;

      7.    SURFACE's payment to a firearms dealer of $5,000 to install ivory grips on three of EVERSOLE's antique firearms on or about November 5, 2002;

      8.    SURFACE'S payment on or about September 1, 2002 of approximately $1,037.64 for lodging expenses for SURFACE, EVERSOLE, and another person at a Texas golf resort; and

      9.    SURFACE'S payment of approximately $880.25 in hotel bills for a trip EVERSOLE and SURFACE took to Arizona and New Mexico from November 19, 2002 through November 23, 2002.

      mmm.  On or about April 30, 2004, EVERSOLE caused to be filed his annual financial disclosure statement for calendar year 2003, in which EVERSOLE failed to disclose, as required by law, his receipt of, among other things, the following things of value:

      1.    SURFACE's payment of $5,225 to install ivory grips on three of EVERSOLE's antique firearms in or about January 2003;

      2.    EVERSOLE's receipt of a $63,000 cashier's check from SURFACE on or about March 24, 2003;

      3.    EVERSOLE's lease, in or about October and November 2003, of an apartment in River Oaks from SURFACE for rent totaling more than $1,000 which was below SURFACE's monthly costs; and

24

4.    SURFACE's payment of over $1,000 in expenses for airfare, lodging and entertainment for EVERSOLE and his wife in Las Vegas for a trip in September 2003.

nnn.    On or about May 2, 2005, EVERSOLE caused to be filed his annual financial disclosure statement for calendar year 2004, in which EVERSOLE failed to disclose, as required by law, his receipt of, among other things, the following things of value:

1.    SURFACE's payment of $16,975 in March 2004 of EVERSOLE's $26,975 bill for landscaping at EVERSOLE's new residence;

2.    SURFACE's guarantee of a personal loan in April 2004 to EVERSOLE in the amount of $25,500 from a bank, the loan itself being disclosed but not the guarantee; and

3.    SURFACE's payment of approximately $1,000 in travel expenses for EVERSOLE and his wife's airfare and rental car fees for a trip with SURFACE and his wife to South Carolina from June 17, 2004 to June 20, 2004.

ooo.    On or about May 3, 2007, EVERSOLE caused to be filed his annual financial disclosure statement for calendar year 2006, in which EVERSOLE failed to disclose, as required by law, his receipt from SURFACE of over $1,000 in travel expenses for the golf trip he took with SURFACE to New Mexico from June 22, 2006 to June 26, 2006.

ppp.    On or about April 29, 2008, EVERSOLE caused to be filed his annual financial disclosure statement for calendar year 2007, in which EVERSOLE failed to disclose, as required by law, his receipt of, among other things, travel expenses in excess of $250 paid for by SURFACE on trips, including travel to San Antonio from June 26, 2007 through June 28, 2007;

25

and travel to Colorado, Wyoming, South Dakota and Montana from June 20, 2007 to June 23, 2007.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### 18 U.S.C. § 666(a)(2)
### Paying a Bribe or Reward to an Agent of
### Organization Receiving Federal Funds

19.    Paragraphs 1 through 13 and 18 are realleged and incorporated as if fully set forth herein.

20.    At all times material to this indictment, Harris County was a local government entity that received federal assistance in excess of $10,000 in each one-year period beginning in 2005 and ending in 2008.

21.    At all times material to the indictment, GERALD R. EVERSOLE was an agent of Harris County, whose duties included, among other things, voting to award and approve contracts for the lease and purchase of real estate to be used to provide County services, to award and approve contracts to build and maintain roads in the County, and to appoint officials to various boards and commissions.

22.    Beginning at least in or about July 2005, in the Southern District of Texas, defendant

### MICHAEL D. SURFACE

did corruptly give, offer, and agree to give a thing of value to any person intending to influence and reward an agent of the Harris County government in connection with a transaction and series of transactions of Harris County, involving $5,000 or more, that is, defendant SURFACE offered

26

and provided EVERSOLE travel and entertainment expenses to influence and reward him for the

use of his position to assist SURFACE in obtaining and funding the Annex A contract; for

EVERSOLE's continued votes and support for projects previously awarded to SURFACE and

his partners, including Murworth I, Murworth II, the Westpark Toll Road contract, and the

Precinct One Maintenance Camp; and for Surface's re-appointment as Chairman of the Sports

and Convention Corporation.

All in violation of Title 18, United States Code, Section 666(a)(2).

## COUNT THREE
### 18 U.S.C. § 666(a)(1)(B)
### Receipt of a Bribe or Reward by Agent of
### Organization Receiving Federal Funds

23.     Paragraphs 1 through 13 and 18 are realleged and incorporated as if fully set forth

herein.

24.     At all times material to this indictment, Harris County, Texas was an organization

of a local government that received federal assistance in excess of $10,000 in each one-year

period beginning in 2005 and ending in 2008.

25.     At all times material to this indictment, defendant **GERALD R. EVERSOLE**

was an agent of Harris County, Texas, whose duties included awarding contracts for the lease

and purchase of real estate to be used to provide County services, for the approval of contracts to

build and maintain roads in the County, and to appoint officials to various boards and

commissions.

26.     Beginning at least in or about July 2005, in the Southern District of Texas,

defendant

**GERALD R. EVERSOLE**

did corruptly solicit, demand, accept and agree to accept a thing of value from a person, intending

to be influenced and rewarded in connection with a transaction and series of transactions of

Harris County, Texas involving $5,000 or more, that is, defendant EVERSOLE solicited and

accepted free trips and travel and entertainment expenses from SURFACE, intending to be

influenced and rewarded for the use of his position to assist SURFACE in obtaining and funding

the Annex A contract; for EVERSOLE's continued votes and support for projects previously

awarded to SURFACE and his partners, including Murworth I, Murworth II, the Westpark Toll

Road contract, and the Precinct One Maintenance Camp; and for Surface's re-appointment as

Chairman of the Sports and Convention Corporation.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT FOUR
### 26 U.S.C. § 7206(1)
### Filing False Income Tax Return

27. Paragraphs 1 through 13 and 18 are realleged and incorporated as if fully set forth

herein.

28. On or about April 15, 2004, in the Southern District of Texas, and elsewhere,

defendant

**GERALD R. EVERSOLE,**

a resident of Houston, Texas, did willfully make and subscribe a joint U.S. Individual Income

Tax Return for the calendar year 2003, which was verified by a written declaration that it was

made under penalties of perjury and which he did not believe to be true and correct as to every

material matter.  That income tax return that was filed with the Internal Revenue Service reported

28

that the total income for he and his wife was $147,930, and that they had no other income which

was not described in the return, when in truth and in fact, as he then and there well knew and

believed, he had received additional unreported income from MICHAEL D. SURFACE.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT FIVE
### 26 U.S.C. § 7206(1)
### Filing False Income Tax Return

29.    Paragraphs 1 through 13 and 18 are realleged and incorporated as if fully set forth

herein.

30.    On or about April 15, 2005, in the Southern District of Texas, and elsewhere

defendant

### GERALD R. EVERSOLE,

a resident of Houston, Texas, did willfully make and subscribe a joint U.S. Individual Income

Tax Return for the calendar year 2004, which was verified by a written declaration that it was

made under penalties of perjury and which he did not believe to be true and correct as to every

material matter.  That income tax return that was filed with the Internal Revenue Service reported

that the total income for he and his was $146,113, and that he had no income other than the

income described in the return, when in truth and in fact, as he then and there well knew and

believed, he had received additional unreported income from MICHAEL D. SURFACE.

All in violation of Title 26, United States Code, Section 7206(1).

**FORFEITURE**
**18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461( c)**

31.    . The allegations in paragraphs 1 through 13 and 18 of this Indictment are hereby

realleged and incorporated by reference for the purpose of alleging the government's intent to

forfeit property belonging to the defendant pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

32.    Upon conviction of an offense in violation of Title 18, United States Code,

Sections 666 set forth in Counts Two and Three of this Indictment, the defendant,

**GERALD R. EVERSOLE,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal,

which constitutes or is derived from proceeds traceable to the offense, including, but not limited

to: certain historic Colt firearms, and the EVERSOLE's residence, located at 1142 Lawrence St.,

Houston, Texas.

**SUBSTITUTE ASSETS**

33.    If any of the property described above, as a result of any act or omission

of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL.

ORIGINAL SIGNATURE ON FILE

Foreperson

JOSE ANGEL MORENO
United States Attorney

JACK SMITH
Chief, Public Integrity Section

By:

Mary K. Butler
John P. Pearson
Trial Attorneys
Public Integrity Section
U.S. Department of Justice