## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CASE NO.  H-10cr886** |
| | § | |
| **GERALD R. EVERSOLE and** | § | |
| **MICHAEL D. SURFACE,** | § | |
| | § | |
| **Defendants.** | § | |

## SENTENCING MEMORANDUM

The United States of America, by and through its undersigned attorneys, respectfully submits the following sentencing memorandum.

## I.   INTRODUCTION

Over the seven year period from 2000 to 2007, defendant and former Harris County commissioner Gerald R. Eversole accepted over $100,000 in concealed benefits from co-defendant Michael D. Surface, while simultaneously voting to award Surface multiple multi-million dollar county contracts.  On September 30, 2011, Eversole pleaded guilty to lying to the FBI about those benefits, which included $63,000 for his new home and $16,975 for landscaping at that home.  The same day, defendant Surface pleaded guilty to willfully filing a false income tax return by claiming the $16,975 as a legitimate business expense, and in that plea Surface admitted that he gave Eversole both things of value in order to influence him.

For Eversole, the crime of conviction is a violation of 18 U.S.C. § 1001 -- making false statements. For Surface, the crime of conviction is a violation of 26 U.S.C. § 7206 -- filing a false income tax return. The applicable Sentencing Guidelines for both defendants result in a total offense level of six and a sentencing range of 0–6 months. After considering the applicable Guidelines range, and the sentencing factors laid out in 18 U.S.C. § 3553(a), this Court should sentence both defendants to six months in prison and levy a fine.

## II.    LEGAL BACKGROUND

### A.    Applicable Law

After the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Fifth Circuit's case law "recognizes three types of sentences under the new advisory sentencing regime: (1) a sentence within a properly calculated Guideline range; (2) a sentence that includes an upward or downward departure as allowed by the Guidelines, which sentence is also a Guideline sentence; or (3) a non-Guideline sentence which is either higher or lower than the relevant Guideline sentence." United States v. Tzep-Mejia, 461 F.3d 522, 525 (5th Cir. 2006) (citing United States v. Smith, 440 F.3d 704, 707 (5th Cir. 2006)). In sentencing a defendant, a district court "must first calculate the Guideline range and consider the appropriateness of a sentence within that sentencing range to fulfill its duty to consider the Sentencing

Guidelines as advisory and as a frame of reference." Id. (internal citations omitted).

A district court is not, of course, bound by the advisory Guidelines, and "the sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guidelines sentencing range and all facts relevant to the determination of a non-Guidelines sentence." United States v. Mares, 402 F.3d 511, 518 (5th Cir. 2005). After considering the applicable facts and the "individualized, case specific factors spelled out in § 3553(a)," a district court may impose a Guidelines or a non-Guidelines sentence. Tzep-Mejia, 461 F.3d at 527.[1]

### B.    Guidelines Calculation

Defendant Eversole and the United States agree that, under U.S.S.G. § 2B1.1, the base offense level applicable to this offense is **6**, and that a **2**-level adjustment is applicable for obstruction of justice, under U.S.S.G. § 3C1.1. See Eversole Plea Agreement, ¶ 11(a). Defendant Surface and the United States agree that, under U.S.S.G. § 2T1.1, the base offense level applicable to this offense is **8**. See Surface

---

[1]    The Probation Office has identified a potential upward departure under U.S.S.G. § 5K2.21. Paragraphs 11(d) and 13(d) of the Plea Agreements with defendants Eversole and Surface, respectively, state as follows: "The United States and the defendant each agree to recommend sentencing within the stipulated Guidelines range under the United States Sentencing Guidelines. However, the defendant understands the Guidelines are 'effectively advisory' to the Court. United States v. Booker, 543 U.S. 220, 245 (2005). Accordingly, the defendant understands that, although the Court must consult the Guidelines and must take them into account when sentencing defendant, the Court is not bound to follow the Guidelines nor sentence defendant within the Guidelines range."

Plea Agreement, ¶ 13(a).  Assuming that each defendant accepts responsibility for the full range of his criminal conduct, the government will also agree that a **2**-level downward adjustment for acceptance of responsibility is warranted under § 3E1.1, resulting in an adjusted offense level of **6**, and a resulting Guidelines range of 0–6 months for each defendant.

## III.    FACTUAL ANALYSIS

The facts of this case are simple.  In order to further his business and political ambitions, Surface gave Eversole money, guns, and trips—among other things. When the FBI interviewed defendant Eversole about these things of value, Eversole deliberately lied to the FBI.  And when defendant Surface filed his 2004 joint federal income tax return, he falsely deducted as a legitimate business expense the $16,975 he paid Eversole in order to influence him.

### A.    Things Of Value Offered by Surface and Accepted by Eversole

As both defendants admitted, defendant Eversole served as the elected Harris County Commissioner for Precinct Four from roughly 1991 through October 1, 2011. In this capacity, Eversole wielded significant power and influence, including overseeing the daily operations of Precinct Four.  He also proposed and voted on numerous county contracts, including agreements to lease and purchase land and buildings needed to carry out the functions of the County, and to build and maintain

-4-

roads in the County. During his tenure, Eversole voted to award four multi-million dollar contracts to corporations owned by Surface as well as proposed and voted to appoint Surface as a member and the chair of the Board of Directors for the Harris County Sports and Convention Corporation. See Eversole Factual Basis (attached as Ex. A), ¶¶3-4, 7-9; Surface Factual Basis (attached as Ex. B), ¶¶3-4, 7-9.

At the same time Eversole voted to award Surface contracts and the appointments, Surface rewarded Eversole with over $100,000 in things of value. These included:

- $63,000 for the purchase and construction of defendant Eversole's new home and $16,975 for residential landscaping expenses at defendant Eversole's new home. Eversole Factual Basis, ¶¶10-11; Surface Factual Basis, ¶¶10-11;

- A $25,000 loan guarantee, including a check written directly to the bank for collateral;

- $8,000 to buy defendant Eversole's unwanted firearms safe and gym equipment;

- A $1,000 custom tailored suit;

- $11,000 to bail out defendant Eversole's failed spur business;

- Over $30,000 in antique Colt revolvers, as well as ivory grips for those firearms; and

- Thousands of dollars in travel expenses, including airline tickets, hotel rooms, rental cars, entertainment expenses including a Las Vegas entertainer, cowboy ranch reservations, golf course fees, and restaurants

both in and outside of Houston.[2]

## B.    __Concealment and Intent__

The two most valuable items Surface provided to Eversole consisted of a $63,000 cashier's check that Eversole applied to the purchase price of his new home, and $16,975 in free landscaping at that home. Both men tried to hide these things of value, which, as Surface ultimately admitted in his factual proffer, were provided with the intent to influence Eversole in connection with the multi-million dollar contracts and Sports and Convention Corporation chairmanship. Surface Factual Basis, ¶12.

### 1.    Surface's Concealment

Surface concealed the $63,000 by using four separate checks, filtered through three separate bank accounts. In March 2003, Eversole needed precisely $63,000 beyond what he already had on deposit to purchase the lot on which his new home would be built. Rather than simply giving Eversole (or his bank) a check for the remaining amount, Surface took multiple steps to conceal the transfer of this money. First, Surface wrote a $65,000 check from his personal account to Weston Lakes, L.P., a dormant corporation he owned, and then wrote a second check from the Weston Lakes bank account to The Keystone Group, his primary corporation.

---

[2]    A chart prepared by FBI Financial Analyst Kathryn Prado which details the travel expenses provided to Eversole by Surface was admitted at trial and is attached as Exhibit C.

Surface then used Bill Gravenor and Tom Robinson, two of his colleagues at the Keystone Group, to have the Keystone Group's bank account issue a third check for $65,000 back to Surface himself.  Surface then took this fourth check and used it purchase a $63,000 cashier's check, which he provided to Eversole.

Defendant Surface also provided the landscaping expenses surreptitiously.  He ordered the landscaper who performed the work to bill defendant Eversole $10,000 and to bill the remaining amount -- $16,975 -- to Sierra Golf Corporation, another corporation half owned by defendant Surface.  Surface Factual Basis, ¶13.  The landscaper had not performed any work for Sierra Golf. Following defendant Surface's instruction, the landscaper billed defendant Eversole $10,000.00 and falsely billed Sierra Golf the remaining $16,975.  Id.  Surface's action caused both the creation of a false invoice by the landscaper and false accounting records by Sierra Golf to record the payment of that invoice.

Defendant Surface then caused Sierra Golf to list the $16,975 payment to the landscaper as a false business expense on its 2004 1120-S corporate tax return and to improperly deduct that amount from the corporation's 2004 ordinary business income causing Sierra Golf's return to falsely state its income.  Surface Factual Basis, ¶14 . Defendant Surface subsequently caused 50% of this deduction -- $8,488 -- to be deducted from his total income on his 2004 1040 joint income tax return causing

-7-

his 2004 joint income tax return to falsely state the total income. Id. at ¶15. Thus, defendant Surface's 2004 joint income tax return filed with the Internal Revenue Service ("IRS"), which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter, was false; Surface reported that he had no other income which was not described in the return, when in truth and in fact, as he then and there well knew and believed, his total income was at least $8,488 higher. Surface Factual Basis, ¶16.

### 2.   Eversole's Concealment

Defendant Eversole also hid Surface's largesse, both contemporaneously and after the fact. As an elected public official, ostensibly serving the people of Harris County, Eversole was required to file yearly financial disclosure forms. Eversole signed each form, swearing that the financial statement was "true and correct" and contained all of the required information. Yet he never disclosed the $63,000, nor the $16,975 he received from Surface.[3]

Similarly, when confronted by the FBI about his relationship with Surface, Eversole made the deliberate choice to lie. On December 7, 2007, defendant Eversole was interviewed at his home by FBI agents. During the interview, the agents asked

---

[3] Nor, of course, did Eversole disclose the $25,000 loan guarantee provided by Surface in 2005, the multiple vintage Colt firearms purchased by Surface, or any of the dozen trips in which Surface paid for Eversole's travel expenses.

Eversole about any and all gifts or things of value he had received from defendant Surface. Eversole Factual Basis, ¶12. In response, defendant Eversole stated that he had received two gifts from defendant Surface as birthday presents. Id. The FBI agents inquired if there were any other or additional gifts or things of value defendant Eversole  had received from defendant Surface.  Id. Defendant Eversole falsely replied that the two birthday gifts were the only gifts or things of value he had received from defendant Surface when, in fact as he well knew, he had received other substantial gifts and things of value from defendant Surface, including those detailed above. Id.

Eversole also lied to the FBI about his travel with Surface. When agents asked about any travel with Surface or his partner, Andrew A. Schatte, Eversole replied that he recalled one trip, to see a golf course owned by Schatte in California.  When agents followed up by asking if there were any other trips, Eversole said no.  In reality, Eversole had traveled extensively and recently with Surface, including three trips in 2007 alone.  Eversole lied about his travel with Surface even though he had flown with Surface, on plane tickets paid for by Surface, to Reno only two months earlier.

## IV.    LEGAL ANALYSIS

Whether it adopts the parties' calculation of the appropriate Guidelines or departs upward, the task for this Court is to fashion a just sentence from the factors laid out in 18 U.S.C. § 3553(a) and the facts of this case.  Anchoring this process is the principle that the Court can and should consider the corrupt payments to Eversole from Surface, not just each defendant's concealment of those payments.  As the Supreme Court recently reiterated in Pepper v. United States, ___ U.S. ___, 131 S. Ct.1229, 1235 (2011), "sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentence and that '[h]ighly relevant -- if not essential -- to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" Pepper, ___ U.S. ___, ___, 131 S. Ct. at 1235 (quoting Williams v. New York, 337 U.S. 241, 246-247 (1949)).  Congress codified this principle in 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and in § 3553(a), which sets forth factors that sentencing courts must consider.

Following these principles, this Court should sentence Eversole and Surface to six months in prison based on all of their relevant conduct: Eversole's shameful

attempt to sell his office for a new house, a landscaped lawn, and trips to visit the Southwest, and Surface's attempts to buy both Eversole's good favor and a stepping stone for his own political career.  See United States v. Harper, 448 F.3d 732, 735 (5th Cir. 2006) (a district court may find the facts relevant to a defendant's Guidelines calculation by a preponderance of the evidence).  The people of Harris County were entitled to know that one of their elected officials lived in a house and looked out daily at a vista funded by a man made wealthy by county contracts.  Instead, Eversole and Surface hid their financial relationship at every opportunity, with obvious motivation: the less the public knew, the more they both profited.

Even if this Court looks only at Eversole and Surface's offense conduct, however, it is clear both men merit a sentence of imprisonment.

### A.    The Seriousness of the Offense

The "nature and circumstances of the offense," as well as "the need for the sentence imposed to reflect the seriousness of the offense," indicate that this Court should impose a sentence of six months' imprisonment for both defendants. § 3553(a)(1), (a)(2)(A).  The offense conduct was no oversight, but a calculated attempt to avoid investigation and prosecution that both defendants saw coming.  The investigation of the relationship between Surface and Eversole constituted a multi-year probe into municipal corruption that involved careful work by prosecutors and

agents in the Central District of California, the Southern District of Ohio, the Eastern District of Louisiana, the Southern District of Texas, and the Criminal Division of the Department of Justice. Agents were alerted to the particular allegations of misconduct in the Surface-Eversole relationship when investigating Surface's relationship with another public official, former City of Houston Building Services Director Monique McGilbra. That investigation led not only to the guilty pleas of McGilbra and Houston-based businessman Gary Thacker, but the indictment of Surface and his business partner Andrew Schatte, and Surface's guilty plea in that case. See United States v. Schatte & Surface, Case No. 08-29 (S.D. Tex.).

In investigating McGilbra and Surface, it became apparent that Surface had a close relationship to Eversole and had hired a member of Eversole's family. What was not apparent, however, were the answers to a series of questions central to whether criminal charges arising from the Eversole-Surface relationship were appropriate. These questions included:

- Did Surface provide any financial benefit to Eversole or on his behalf?

- Did Eversole take any official action that benefitted Surface?

- Did Eversole or Surface disclose any financial benefits provided to Eversole?

Consistent with the seriousness of the allegations, the criminal investigation

that followed sought both documentary and testimonial evidence from a wide range of sources.  The nature and context of the investigation -- which involved a powerful, sitting County commissioner -- required witnesses to divulge confidential and sensitive information to investigators.  County officials met with investigators and disclosed communications and deliberations at the highest level of county government.  The County provided extensive documentary evidence regarding the inner workings of how County contracts are bid and awarded.  Witnesses, both in and outside of the County, disclosed sensitive personal information relevant to the investigation.  The need to balance the important and varied interests affected by this investigation at time led to difficult negotiations resulting in compromises by both witnesses and investigators.

The manner in which witnesses ranging from elected County officials to ordinary citizens participated in this criminal investigation, disclosing to investigators information that few of them were eager to share, is a testament to the strength of a fundamental principle of our nation's justice system: that the law is entitled to every man's evidence.  Inherent in this principle is the obligation of a witness to tell the truth, whether under oath, on a notarized form, on a tax return, or when choosing to speak to the FBI.  See United States v. Mandujano, 425 U.S. 564, 576 (1975) (commenting, with respect to perjury, "Congress has made the giving of false answers

a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it."); see also Nix v. Whiteside, 457 U.S. 157, 185 (1986) ("This Court long ago noted: 'All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth . . . .;") (quoting In re Michael, 326 U.S. 224, 227 (1945)). Despite the competing public and private interests implicated by this investigation, and the high stakes for many of those asked to provide information, witnesses from all stations in life were required to accept and comply with their legal obligations.

It is against this background that defendant Eversole and Surface's conduct must be judged. Defendant Eversole knew well the options available when the FBI interviewed him. He, of course, could have told the truth, even if, as was the case for many other witnesses, doing so risked the possibility of criminal prosecution, or personal or political embarrassment. He also could have declined to speak to the FBI agents, invoked his Fifth Amendment rights, or challenged any lines of inquiry he believed to be improper.

Regrettably, Eversole chose the one option that the law prohibited: he lied. He lied deliberately and repeatedly to FBI agents. He lied about the central issue in the investigation: whether Surface had offered, and whether he had accepted, things of value from a real estate developer who did business with the County. Eversole lied,

-14-

and he lied about what mattered.

These lies had two results. First, they made the task of learning the truth about Surface and Eversole's relationship much more difficult. His lies required the government to expend substantial time and resources attempting to determine what, if any, benefits had been provided by Surface to Eversole, and what, if any, of the information provided by Eversole could be believed.

More fundamentally, however, Eversole's lies corrupted a truth-seeking process with respect to an important investigation, and on behalf of which many others subordinated important public, professional, and personal interests. To minimize the seriousness of this conduct would deprecate the value that the judicial system places on the truthfulness of witnesses, and tempt future witnesses who face similar situations to question the wisdom and necessity of doing so.

Our criminal justice system rests on the premise that all witnesses have an equal and solemn obligation of candor. This candor cannot be taken for granted, because the daily work of the criminal justice system depends on the willingness of every witness -- whether an eyewitness to a violent crime or drug transaction, a police officer who witnessed a partner shake down a drug dealer, or a corporate executive aware of fraud by his or her colleagues -- to tell the truth under circumstances where there often are strong motives to do otherwise. Particularly in a case such as this,

where Eversole was an elected official at the highest level of county government, whose lies were central to issues in a significant criminal investigation, it is important that this Court impose a sentence that accurately reflects the value the judicial system places on truth-telling in criminal investigations.

Similarly, defendant Surface's conduct -- taking a false tax deduction in order to cover up a bribe -- implicates the fairness of our system. Citizens are required to pay their fair share of taxes, and lying about concealed benefits paid to public officials is obviously no exception. Surface, in effect, doubled down: he paid Eversole through his side corporations, and then took a tax deduction in order to conceal the payment on the corporation's books and to benefit himself.

### B.    The "History and Characteristics of the Defendant[s]"

The history and characteristics of each defendant reveal that their conduct in this case was not a one-time mistake. Defendant Eversole not only lied to the FBI, but he lied to the people of Harris County, on a yearly basis. Each time he took a trip paid for by Surface -- or a loan guarantee, or a vintage Colt revolver -- he was required to list that item on his annual financial disclosure form. Yet Eversole disclosed none of the payments, whether characterized as gifts, loans, loan guarantees, travel expenses, or anything else.

Even more egregiously, Eversole's concealment is serial. In the early 1990s,

the defendant was indicted by the State of Texas for perjury and official misconduct in connection with false campaign finance disclosure forms. These charges were based on the defendant's practice of converting campaign funds to his personal use, and then claiming that the conversion was to "reimburse" himself for cash expenditures related to his campaign. These charges were dismissed by the state trial court, a decision upheld by the 14th District Court of Appeals on the ground that the State had selected improper statutes under which to charge Eversole. See State v. Eversole, 889 S.W.2d 418, 425-26 (Tex. App.–Houston [14 Dist.] 1994); State v. Eversole, 1998 WL 429771, *3 (Tex. App.–Houston [14[th] Dist.] 1998) (unpublished op.) .

Yet Eversole's misuse of campaign funds, and his false campaign finance disclosure forms, continued. In July 2009, the Texas Ethics Commission investigated a sworn complaint that, in 2007 alone, Eversole had converted over $200,000 in campaign funds to personal use. Following its investigation, the Commission concluded, based on "credible evidence," that Eversole had violated the Texas Election Code both by "failing to properly disclose the purpose of expenditures" and by converting contributions to personal use. Eversole entered into an agreed resolution with the Ethics Commission, as part of which he reimbursed his campaign over $40,000 from his personal funds. (The resolution is attached as an Exhibit D to

this memorandum.) Eversole also agreed to pay a $75,000 fine, which at the time was the largest in the history of the Texas Ethics Commission.

Defendant Surface, for his part, is also a serial offender. As noted above, Surface was investigated and prosecuted for providing things of value to Monique McGilbra, a former City of Houston official who was in charge of two lucrative City contracts sought by Surface. McGilbra pleaded guilty to conspiring with Surface, among others, to corruptly accept these things of value (which included cash, a $1,000 gift certificate, travel expenses, and a $3,000 per month consulting agreement with her then-boyfriend) in exchange for her official action benefitting The Keystone Group. Surface himself pleaded guilty on September 30, 2011, to lying to the FBI about the things of value he provided to McGilbra. Surface's concealed payments to Eversole may be the most egregious example of his attempts to buy influence, but it is certainly not the first or only one.

The history and characteristics of both defendants show deliberate and fraudulent conduct time and time again. Moreover, they have been repeatedly unapologetic. The prior, minimal sanctions imposed on defendant Eversole have neither been taken seriously nor deterred him. This Court can and should provide such a deterrent to Eversole, Surface, and others by imposing a sentence of incarceration.

## C.    Other § 3553(a) Factors

The factors that reference the need for the sentence imposed "to promote respect for the law, and to provide just punishment for the offense" as well as "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant" also militate in favor of imprisonment.  As Congress discussed when adopting § 3553:

> [It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures ... and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of a white collar criminal may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S.Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75 (emphasis added).  As a society, we have determined that punishment is a necessary function of an ordered society.  Punishment is a consequence designed to prevent and deter people from engaging in criminal conduct.  Both defendants also owe a debt to society for their conduct.  This Court, therefore, must fashion a sentence  which addresses this factor.

-19-

A sentence below six months will fail to account for defendant Surface's providing things of value to defendant Eversole, a public official, and their covering it up. As this Court is no doubt aware, public corruption involves a breach of trust, both by the public official and the individuals seeking official action. This case presents an opportunity to the Court to send a message that this conduct in public contracting is not only inappropriate, but will be punished. This is especially true for a defendant who provided things of value to multiple public officials in order to influence and reward them.

Finally, the § 3553(a) factor that references the need for the sentence imposed avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" also argues in favor of six months' incarceration. Inherent in the notion of respect for the law is the concept of uniformity of sentences and treating similarly situated individuals the same. When a defendant receives a sentence that is disparately harsh or lenient as opposed to other similarly situated persons, it sends the message that the sentencing is arbitrary and capricious and does not foster a respect for the law or the criminal justice system.

## IV.    **CONCLUSION**

Defendants Eversole and Surface lied to hide their financial relationship. This Court should send the message to other public officials, and others who seek public contracts, that these actions will not be tolerated and no one, not even the powerful, is above the law. For the reasons above, the government requests that the Court sentence both defendants to incarceration.

Respectfully submitted,

JACK SMITH
Chief
Public Integrity Section


by:    /s/ *John P. Pearson*
PETER MASON
JOHN P. PEARSON
Public Integrity Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., NW - 12th Floor
Washington, DC  20530
T: 202-307-2281
F: 202-514-3003

## <u>Certificate of Service</u>

I hereby certify that on 22 December 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel for defendant.

/s/ *John Pearson*
John P. Pearson
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice